Arkady Bukh, Esq.
The Law Offices of Bukh and Associates PLLC
1123 Avenue Z
Brooklyn, NY 11235
Tel.: (718)376-6466
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW YORK

SOUTHERN DISTRICT

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DMITRY NASKOVETS<br><br>Defendant. | 10CR 317-01(LAK)<br><br><br>**SENTENCING MEMORANDUM** |
|---|---|

Defendant, Dmitry Naskovets, by his attorney, Arkady Bukh, Esq., respectfully submits the instant Sentencing Memorandum as an addendum to the information presented in the Pre – Sentencing Investigation Report ("PSR"), previously filed in this matter.  The defendant stands before this Court for sentencing, having pled guilty to counts 1 and 2 contained in the Indictment 10 Cr. 317-01 (LAK).  The first count charged Mr. Naskovets, along with others, with conspiring to commit wire fraud in violation of Title 18 USC Sec. 1343.  The second count charged Mr. Naskovets and others with conspiracy to commit access device fraud with violations of 18 USC 1029(a)(2) and (a)(5).

The purpose of this Memorandum is to acquaint the Court with additional relevant information and factors regarding Mr. Naskovets background and circumstances and to

offer information relating to sentencing issues and options, which, in counsel's view, would best satisfy the interests of both the community and offender.

Mr. Naskovets acknowledges and accepts both his legal and moral culpability and responsibility for the criminal acts to which he pled guilty under counts 1 and 2 of the indictment.

Considering Mr. Naskovets background and personal history together with an analysis of the 18 USC 3553(a) factors, the dual interests of the community and Mr. Naskovets, will best be protected and satisfied by a sentence of time served having been incarcerated since mid September, 2010 when he was extradited here from the Czech Republic for the purpose of facing prosecution. Mr. Naskovets is currently the subject of a removal hearing by the United States Immigration and Naturalization Service and in all likelihood be removed to the Czech Republic or Belarus. Other than his being extradited to the United States, he has no independent status or basis to remain.

**Post-Booker Sentencing Landscape**

Following the Supreme Court's decision in Booker, the sentencing guidelines are no longer mandatory, and a Court should no longer presume that a sentence calculated pursuant to the Guidelines is appropriate. United States v. Booker, 543 U.S. 220 (2005). Instead a district court must consider the other sentencing goals listed in 18 U.S.C. § 3553(a)[1], and not just the Guidelines, in sentencing an individual. United States

---

[1] The § 3553(a) factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant, and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner ; (3) the kinds of sentence and sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the sentencing

v.Rattoballi, 452 F.3d 127, 132 (2nd Cir. 2006).  Under Booker, after considering all these factors, the Court must then independently determine whether to impose a sentence within the Guidelines range is reasonable.

To comply with the purpose of sentencing set forth in 18 U.S.C. §3553(a), the Court must impose a sentence that is sufficient, but not greater than necessary.  United States v. Sindima, 2007 WL 1462390 (2nd Cir. May 21, 2007).  The post –Booker sentencing methodology requires the Court to impose a sentence that is based on the whole person before the Court, rather than a systematic cold numerical calculation. Probation has recommended a guideline sentence at a level 20, which translates to an sentence of imprisonment in the range of 33-41 months imprisonment.  After full consideration by the Court of the 18 U.S.C. §3553(a) factors, a sufficient, but not greater than necessary sentence is time served.  If this court finds a further term of imprisonment is reasonable, said term should range from 12-16 months factoring in the applicable factors contained within the Sentencing Guidelines and 18 USC 3553(a).

### Application of Relevant § 3553(a) Factors to Defendant

The numerous factors outlined in § 3553(a) and those most relevant to Dmitry's case can be summarized into three general categories: (a) biography of the defendant; (b) the nature and circumstances of the offense; and (c) the need for just punishment and deterrence of criminal conduct.  These factors demonstrate that incarcerating Mr. Naskovets would serve no worthwhile purpose.  The government's dual interests in

---

guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

appropriate punishment and effective deterrence are more than amply met through his current confinement, the forfeiture of his apartment and contents and restitution.

**A.  Biography of Mr. Naskovets**

Dmitry Naskovets was born on September 9, 1984, in Borisov, Belarus.  He was the only child from the union between Mikhail and Taisa Naskovets.  Dmitry was raised in the Christian Orthodox tradition.  Dmitry had a happy childhood despite his mother marrying and divorcing three times, resulting in Dmitry having a biological father and two stepfathers.  Through all this Dmitry was able to maintain amicable relationships with each of his father figures. In 1987 his parents divorced.  He lived with his mother until the age of 16.

During his childhood, Dmitry took an interest in participating in competitive sports. Between the ages of 7 and 14, Dmitry participated in swimming competitions with daily swimming practice and entering into swimming matches throughout Belarus. Between the ages of 14-18, Dmitry participated in competitive shooting. This involved shooting air rifles at moving targets in various matches again throughout Belarus. As a result of his swimming and shooting skills, Dmitry won various medals in both activities.

For most of his formative years, his biological father played little or no role in Dmitry's  life.  His biological father barely made yearly visitation visits and did not provide any significant support to either him or his mother. During this time his mother, despite her hard work just earned enough to provide an apartment and basic necessities for him, his maternal grandmother and his mother who, because of economic necessity, lived together in three bedroom apartment.

Dmitry renewed his relationship with his biological father and paternal grandfather when he went to live with them between 2000 and 2002. Dmitry's dad took a more significant role in Dmitry's life as well as providing financial support for Dmitry.

In 2005, when Dmitry was 19, Dmitry's biological father was murdered in what was described as a random act of violence, being beaten about the head with a metal pipe. No one was ever charged in this matter. At the time of his father's death, Dmitry's father was living in Belarus and working as a construction worker.

Dmitry was the product of a broken home with few comforts and suffering through the traumatic violent death of his biological father. Dmitry coped by concentrating and doing well in school. Dmitry attended high school and completed three years of college specializing in finance before attending Minsk University of Management where he obtained a degree in finance, a degree equivalent here to a master's degree.

Between 2004 and 2006, Dmitry worked as a manager at two branches of Belarus Bank while attending school. His position involved overseeing the cash department which supplied smaller branches with operating capital.

In 2006 Dmitry took classes in connection with employment as a sales manager of a Parad car dealership in Minsk, Belarus selling Chinese cars. By taking these courses, Dmitry was able to advertise and sell these vehicles. While in Minsk he ran into his former classmate and alleged co-conspirator Semashko on the subway in Minsk. They would meet again two years later.

On March 20, 2009, Dmitry married Katsyania Aheyeva in Minsk, Belarus. They had met six years prior when they were both students during which time they maintained

a strong, evolving and steady relationship. Due to their youth and economic situation they planned to hold off having a family till later.  Dmitry's wife is also well educated having obtained two post-graduate degrees, one in advertising management the other as a painting teacher for children.  Despite this she works selling shoes in a boutique.

Until June, 2009, Dmitry lived his entire life in Belarus.  In light of the poor economy and business atmosphere in Belarus, he and his wife mutually agreed to move to Prague, Czech Republic to start their own business, a pet supply store.  Dmitry set up a business called DKN Media and at the time of his arrest in 2010, he was scouting locations to establish their pet supply business.

After his arrest, his wife had to move back to Belarus due to her not being able to afford the rent on their Prague apartment.  Since July 2010, Dmitry's wife has been living with her parents in Borisov, Belarus.

Dmitry's family is fully aware of his situation and has been emotionally supportive. Dmitry stays in contact with his wife and family by daily emails or by telephone. Dmitry's wife and parents are hoping for a quick resolution of this matter.

Dmitry has no history of drug or alcohol abuse and this is his first brush with the law.  He has no history of violent behavior nor is he being charged with or pleading to any act of a violent nature. He is an intelligent, well educated individual with a competitive personality as demonstrated by his participation and excelling in competitive sports as a young boy and teenager. Other than a brief experimental period in 2002 with marijuana, Dmitry has no history of drug or alcohol abuse and no history of juvenile delinquency.  He was extradited here from Prague, Czech Republic on September 17, 2010 for the purposes of this prosecution and has been held in detention ever since. While

in detention he has completed a GED pre test and was scheduled to take the GED exam. He is currently the subject of removal proceedings by I.C.E.

### B. Nature and Circumstances of the Offense

Prior to being extradited to the United States to face the current criminal charges, Dmitry was detained by the police in Prague where, on May 20, 2010, he voluntarily gave a statement to agents of the Federal Bureau of Investigation. According to his statement, Dmitry again ran into his banking school friend two years later after his encounter on the metro in Minsk.  At that time, his friend, Mr. Semashko told Dmitry that he had a business idea and that Dmitry, because of his knowledge of English, may be of some help.  Semashko gave Dmitry a cell phone number and told him if he was interested to call.

After some time, Dmitry did call to find out some more information as to what kind of business opportunity his friend had been talking about and he was invited to Semasko's home.  Dmitry, coming from a poor working class background was impressed with Semashko's luxury apartment and being informed that the business opportunity being offered involved a lot of money.

Dmitry out on the world alone ,with no father for guidance and a mother who barely got by, was easily swayed by the dream of obtaining a comfortable life for himself and being able to have all those things that he did not have while growing up.  After a while, despite knowing better, greed got the better of him and Dmitry began working with Semashko in January 2007 until his detention by the Czech authorities in 2009.

While detained by the authorities in Prague, Dmitry, while attempting to minimize his culpability in the criminal scheme, provided a detailed statement to the FBI

which included the names of various websites and passwords used in the conduct of the scheme. He provided his skype account, email addresses, access to his ICQ and the data contained on his computers to the authorities as well as identifying other members of the scheme and a detailed description of how the scheme operated. He also unequivocally expressed his desire to cooperate fully with the police.

### C. The Need for Just Punishment and Deterrence of Criminal Conduct

**a.  Just Punishment**

Now that the Sentencing Guidelines themselves have been held to be discretionary pursuant to United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed.2d 621(2005) and by the Second Circuit's decision in United States v. Crosby, 397 F3d 103(2d Cir., 2005),  In determining a sentence and to comport with the Court's statutory responsibility of imposing a "'sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing" (Kimbrough v. United States, 552 U.S. 85, 128 S. Ct. 558,570, 169 L .Ed. 2d 481(2007)) the sentencing court is to impose sentence after consideration of all the factors identified in 18 USC 3553(a), including the advisory guidelines.

In Gall v. United States, 552 U.S. 38, 128 S. Ct. 169, L. Ed2d 445 (2007) the United States Supreme Court explained it this way:

> [A] district court should begin sentencing proceedings
> by correctly calculating the applicable Guidelines range.
> As a matter of administration and to secure nationwide
> consistency, the Guidelines should be the starting point
> and the initial benchmark. The Guidelines are not the only
> consideration, however. Accordingly, after giving both parties
> an opportunity to argue for whatever  sentence they deem
> appropriate, the district judge should then consider all of the
>  Sec. 3553(a) factors to determine whether they support the sentence
> requested by a party. In so doing, he may not presume that the

>Guidelines range is reasonable. He must make an individualized assessment based on the facts presented.

Id. at 49-50.

The presentence report prepared by the probation  In determining this level applicable, the Probation department, in paragraph G, page 4 of its report, only assumes Dmitry will demonstrate a future acceptance of responsibility, it does not take into account the cooperation Dmitry demonstrated in his statement to the FBI in Prague. When confronted by the authorities, and while attempting to minimize his culpability, he freely admitted to and cooperated with law enforcement authorities.  In addition he gave extensive details regarding the criminal conspiracy, including passwords and internet websites used in furtherance of the criminal conspiracy. The current charges represent Dmitry's first breach of the criminal law.

Section 3553(a), sets forth certain enumerated factors the court is to consider when passing sentence.  The first factor set forth is the nature of the offense and the history of the defendant. The criminal activity alleged, although serious, is of a nonviolent nature. No violence or threat of violence played any part in the offenses charged and there is no allegation of the use or threat of violence contained in the indictment. Nor is there any allegation that a dangerous or deadly weapon was used or was threatened to be used during the course of the offenses charged.

As set forth above, Dmitry came from a broken home and was raised primarily by his mother. Despite her hard work, she was able to provide only a very basic existence for her family economically having to live with Dmitry's maternal grandmother so that his mother could work outside the home without the additional expense of having to pay someone to care for Dmitry while his mother worked. Despite the economic hardship and

9

not having his father around to provide financial and emotional support, so important to a young boy, Dmitry did well academically and in competitive sports.

Dmitry was not an organizer, manager, leader or supervisor of others in the offense. It is clear from the statement Dmitry gave to the FBI in Prague that he was not a person in any such position as to the criminal activities alleged. He was trained by his coconspirator, Semashko, who also assigned him duties Dmitry was to perform. Clearly this is not the description of a leader, manager or organizer.

United States v.Rojas, 2010 U.S. Dist. Lexis 56139, was a criminal matter before the Southern District Courts of New York. The defendant was charged with violating 18 USC 1029(a)(1), (4), (5), (b)(1) and 2. The economic loss suffered as a result of the criminal activities alleges was between $30,000.00 and $70,000.00, the same as in the current matter before the Court for sentencing. The difference here being the number of victims here exceeded 250.

Rojas was sentenced to three years probation and five months of house arrest, a significant departure from the Guidelines range of 10-16 months based on a total offense level of 12 and a criminal history of 1. The sentencing Judge took into consideration the short duration the criminal activity occurred, the defendant's cooperation, his particular family situation in that the defendant had two young children and was attending school, the defendant taking responsibility for his action and voluntarily gave a full statement to the law enforcement authorities.

In the instant matter, Dmitry has accepted full responsibility for his action, gave a full and complete statement to the law enforcement authorities in Prague, including to the FBI and has no prior criminal history.

Although he has no children, he does have a wife who is also affected by Dmitry's confinement, both emotionally and economically.

Dmitry is a well educated, intelligent individual. But even the best of us can succumb to pull of greed. It exists in all of us and given the right combination of environmental and emotional factors, who is to say that they will remain immune to its allure. Dmitry was drawn into this scheme certainly by his own volition but he was pushed by the promise of being able to acquire the good life after living a life on the edge of economic free fall.

Considering these factors along with the factors a reasonable sentence under the circumstances presented would be 12-16 months.

**b. Deterrence:**

Mr. Naskovets pled guilty to two serious felonies with significant up front guideline ranges, no promises of a departure, and with no recommendation from the U.S. Attorney as to the magnitude of the departure.  His guilty plea alone therefore carried a significant- and adequate- deterrent message to the wider community.  Indeed, even more compelling is the direct and collateral consequences of his plea, including his probable deportation, and the powerful message it sent to the public at large, namely-   Mr. Naskovets lost his way, brought dishonor and shame to his family and will carry these felony convictions for the rest of his life. Furthermore, he will no longer be employable in the banking or financial sectors despite his training.

**Conclusion**

For these reasons, Mr. Naskovets respectfully submits that Your Honor consider the possibility to sentence Mr. Naskovets to time served, or, in the alternative, a term of incarceration of 12-16 months.

Dated:

June 17, 2011

>Respectfully submitted,
>
> /s/ Arkady Bukh Esq
>Arkady Bukh, Esq.
>The Law Offices of Bukh and Associates PLLC
>1123 Avenue Z
>Brooklyn, NY 11235
>Tel.: (718)376-6466
>Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2011, a copy of the foregoing document was served on the following persons by the following means:

  x     CM-ECF

U.S. Attorney's
One St. Andrew Plaza
NY, NY 10007

> /s/ Arkady Bukh Esq.
>ARKADY BUKH, ESQ.